[No. 1766-1.    Division One.    May 20, 1974.]

RICHARD R. MILLER, *Appellant,* v. JOHN A. KENNEDY, *Respondent.*

*Murray, Scott, McGavick, Gagliardi, Graves, Lane & Lowry* and *Edward M. Lane,* for appellant.

*Davies, Pearson, Anderson, Gadbow & Hayes, P.S.,* and *Wayne J. Davies,* for respondent.

Callow, J.—The plaintiff, Richard R. Miller, appeals from the trial court's refusal to grant a motion for a new trial or judgment n.o.v. following a verdict for the defendant in a medical malpractice case. The issues concern instructions on res ipsa loquitur, the physician as a guarantor of results, the liability of a physician for a mistake in

judgment and "informed consent." Also presented and discussed are issues regarding the rejection of certain proposed exhibits and the trial court's removal of the claim of faulty post-biopsy care from the jury.

Dr. Kennedy is a board certified specialist in internal medicine, with subspecialties in heart and nephrology, practicing in Tacoma, Washington. The plaintiff first consulted with Dr. Kennedy on January 14, 1970, complaining of fatigue, lightheadedness, tiring out easily and becoming shortwinded with exercise. Dr. Kennedy examined Mr. Miller, wrote down his medical history and took an electrocardiogram. At that time, Dr. Kennedy found that Mr. Miller had first-degree heart block. On January 20, 1970, Mr. Miller returned for further examination and was found to have second- and third-degree heart block. Mr. Miller was immediately hospitalized and placed in intensive care. On January 26, 1970, Mr. Miller was removed from intensive care and placed in a ward.

Many tests were performed to assist Dr. Kennedy in his efforts to diagnose the cause of Mr. Miller's heart disease. Various tests showed evidence of a kidney problem, and therefore Dr. Kennedy felt that a kidney biopsy was necessary. Witnesses for both parties testified that the decision to perform the biopsy was not malpractice. However, Mr. Miller testified that Dr. Kennedy did not advise him of the risk of the loss of the kidney nor explain the alternative ways of performing biopsies. The plaintiff further testified that he would not have consented to the biopsy had he known there was a risk of loss of the kidney. Dr. Kennedy testified that he did so inform the patient, and this testimony is substantially corroborated by the hospital record and by the prior conduct of the doctor in which he diagramed and explained in detail to Mr. Miller what was happening in his heart.

In performing the biopsy, the biopsy needle was inserted some 3 or 4 centimeters above the intended biopsy site. The kidney is encased in an outer capsule covering, inside of

which there is an area called the cortex. The cortex surrounds the medulla which contains the nephrons, which are filtering, absorbing and secreting units doing the essential work of the kidney. The process of forming urine begins when arterial blood flows into a tuft of capillaries, called the glomerulus. The glomerulus is enclosed in a double membrane which leads into a tubule. The glomerulus, membranes and tubule form a single nephron. The glomerulus initially filters out some of the passing blood as do the membranes. The blood fluid then enters the tubule of the nephron where useful sugars, salts and water are reabsorbed by small capillaries and returned to the main bloodstream. The capillaries in turn secrete ammonia through the tubule wall into the fluid remaining which is flowing into the collecting tubule. The resulting comparatively small amount of waste is urine. The medulla area of the kidney contains approximately two and a half million nephrons. Inside the medulla area is the calyceal area, the collecting system of the kidney.

The plaintiff alleged that the biopsy needle was negligently inserted penetrating the calyceal system of the kidney causing damage and injury which eventually resulted in loss of the kidney. The defendant contended that the calyceal area was not punctured and that a small artery may have been injured. There is no dispute in the testimony that the loss of the kidney proximately resulted from the kidney biopsy, that the kidney was healthy prior to the biopsy and that the biopsy specimens were negative as to any of the conditions for which the biopsy was performed. The position of the plaintiff is that the defendant violated the standard of care while the defendant states that the standard of care was met and claims that an unfortunate chance led to the result.

Following the biopsy, the plaintiff remained in the hospital from January 29, 1970, until February 26, 1970, suffering continual bleeding from his kidney and considerable pain. On February 26, 1970, Dr. Kennedy called upon another physician, Dr. Osborne, to examine Mr. Miller. In spite of

his weakened condition and extensive bleeding, Mr. Miller was released from the hospital. Mr. Miller was again, at his own insistence, examined by Dr. Osborne, who removed blood clots from his bladder and returned him home. After the condition returned, Mr. Miller was again hospitalized on March 30, 1970. It was suggested that an operation be performed to see if the upper portion of the kidney, where the bleeding was taking place, could be surgically removed in an attempt to save the balance of the kidney. On April 4, the date set for the surgical procedure, Mr. Miller hemorrhaged, and the surgical procedure was expedited. Dr. Osborne performed this surgery, attempted to remove the upper portion of the kidney, but was unable to do so. Finally, he was required to do a complete nephrectomy, removing the entire kidney. Mr. Miller was released from the hospital on April 10, 1970.

The plaintiff submits that the jury should have been instructed on res ipsa loquitur. The legal doctrine of res ipsa loquitur eliminates the need to prove negligence where (a) the apparatus which caused injury was under the exclusive control of the defendant, (b) the accident ordinarily would not have occurred unless the defendant had been negligent, and (c) the accident was not caused by any action of the plaintiff. *Emerick v. Mayr*, 39 Wn.2d 23, 234 P.2d 1079 (1951); *Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 480 P.2d 260 (1971).

In *ZeBarth v. Swedish Hosp. Medical Center*, 81 Wn.2d 12, 18, 499 P.2d 1 (1972), as in this case, the instruction proposed defined circumstantial evidence, direct evidence and res ipsa loquitur.[1] The plaintiff-appellant challenges

_____

[1]The instruction proposed by the plaintiff was a direct reflection of that approved in *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 354, 382 P.2d 518 (1963). It read:

Evidence is of two kinds—direct and circumstantial. Direct evidence is that given by a witness who testifies directly of his own knowledge concerning facts to be proved. Circumstantial evidence consists of proof of facts or circumstances which a Court of competent experience of mankind or experts in a [*sic*] esoteric field give

the failure of the trial court to give this instruction claiming that the evidence made the instruction imperative. We agree that, under *ZeBarth,* the instruction should have been given. *ZeBarth v. Swedish Hosp.,* in adopting the classic statement respecting res ipsa loquitur as applied to medical malpractice from *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wn.2d 351, 382 P.2d 518 (1963), observed that there must be exclusive control of the instrumentality in the defendant and no voluntary participation or contribution by the plaintiff to the acts producing the injury. If such circumstances exist, then negligence may be deduced[2] without further proof in three situations: (1) where the act causing the injury is so obviously negligent that negligence may be inferred as a matter of law, (2) when people would know from experience that the result would not have happened without negligence, (3) when a physician testifies that the bad result would not have occurred if proper care had been used. In this case, the doctor had exclusive control of the instrumentality, and the patient did not participate in the procedure. The circum-

---

rise of reasonable inference of the truth of the fact sought to be proved.

One kind of evidence is not necessarily more or less valuable than the other.

In connection with the foregoing you are instructed that it is for you to determine whether the matter of the occurrence of the injuries sustained by Richard Miller, and the attendant circumstances connected therewith, are of such character as would in your judgment warrant an inference that the injury would not have occurred had Dr. Kennedy conformed to the standard of care required of him.

The rule is that when an agency or instrumentality which produces injury is under the control of a defendant, and the injury which occurred would ordinarily not have resulted if the person in control had used proper care, then, in the absence of satisfactory explanation, you are at liberty to infer, though you are not required to so infer, that the defendant was at some point negligent, and that such negligence produced the injury complained of by the plaintiff.

[2]The term "inferred" rather than "deduced" is most often used in this connection as connoting the drawing of a conclusion as opposed to "implying" or "intimating."

stances present the inquiry whether an instruction on res ipsa loquitur should have been given. It cannot be said from the vantage point of an unskilled person that the insertion of a biopsy needle into the calyceal area was so palpably negligent that an inference of negligence follows, nor can it be said that the general experience of most people indicates this would not have happened without negligence.

This leaves only the inquiry whether the third situation as recognized under Washington law was present, to wit, an instruction should be given on res ipsa loquitur when medical doctors testify that the injury would not have happened but for some negligent action on the part of the treating physician. *ZeBarth v. Swedish Hosp. Medical Center, supra* at 19. The testimony of the doctors called as witnesses is in conflict. However, the jury was free to believe the testimony of one doctor and disregard the testimony of all the others. The testimony of the medical witness testifying on behalf of the plaintiff was such that the trier of the fact could deduce from that testimony that the defendant was negligent. The law concerning the propriety of instructing on res ipsa loquitur has been the subject of controversy as reflected in *ZeBarth v. Swedish Hosp. Medical Center, supra*; *Zukowsky v. Brown,* 79 Wn.2d 586, 488. P.2d 269 (1971); *Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968); and *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). The currently prevailing trend of the Washington cases would instruct the jury that it could infer negligence when the plaintiff's evidence supports the deduction that the injury would not have occurred otherwise.[3] *Siegler v. Kuhlman,* 81 Wn.2d

---

[3]The opposing view is that instructions from the court (that the jury may infer from the evidence that negligence caused the bad result) may insert the trial court into the jury's evaluation of that evidence (infringing upon their province) tilting the balance of decision by a controlling factor which is not evidence, but a rule of law. *See* the dissents in *ZeBarth* and *Zukowsky.*

448, 502 P.2d 1181 (1972). They were not so instructed here. As stated in *ZeBarth* on page 22:

> Res ipsa loquitur does not, and did not here, operate to deprive defendant hospital of its defense on the merits. Inferences of negligence arising from the doctrine and evidence were met with persuasive evidence to the contrary. But, although defendant presented weighty, competent and exculpatory proof of due and reasonable care and prudence, the ultimate issue of fact was one for the jury to decide.

An inference that negligence caused the injury to the patient may follow from the testimony of the plaintiffs' medical witness, and Washington law[4] entitled the plaintiff to an instruction that the jury could make that inference.

The trial court instructed the jury:

> The law does not hold that physicians or surgeons guarantee results, nor does it require that the result of their treatment be what is desired.

The instruction was proper under the law when considered in the context of all the instructions. A bad result is not, of itself, evidence of negligence. *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963); *Rundin v. Sells*, 1 Wn.2d 332, 95 P.2d 1023 (1939); *Brant v. Sweet Clinic*, 167 Wash.

---

[4] *Riedinger v. Colburn*, 361 F. Supp. 1073 (D. Idaho 1973), held that Idaho law required a showing by a plaintiff that (1) the instrumentality causing injury was under the control of the physician and (2) the circumstances were such that common knowledge and experience would justify the inference that the accident would not have happened in the absence of negligence, for res ipsa loquitur to apply. The court restricted res ipsa loquitur to cases where a layman is able to say that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised. The case states on page 1079:

> In plaintiff's supplemental trial memorandum . . . reliance is placed on the case of Zebarth v. Swedish Hosp. Med. Center, . . . as establishing a more "equitable rule" of further use of the doctrine of *res ipsa* based on the testimony of expert witnesses to create inferences of negligence.

The court declined to follow *ZeBarth* on the ground that the Supreme Court of Idaho had not expanded the rule to permit the application of res ipsa loquitur to cases where medical testimony would lead to an inference of negligence.

166, 8 P.2d 972 (1932); *Hoffman v. Watkins,* 78 Wash. 118, 138 P. 664 (1914). A physician, unless he so contracts, does not warrant or guarantee that an illness or disease will be cured. *Eckleberry v. Kaiser Foundation N. Hosps.,* 226 Ore. 616, 359 P.2d 1090, 84 A.L.R.2d 1327 (1961); *Derr v. Bonney,* 38 Wn.2d 678, 231 P.2d 637, 54 A.L.R.2d 193 (1951); *Fritz v. Horsfall,* 24 Wn.2d 14, 163 P.2d 148 (1945). A doctor is neither an insurer that health will return to a patient nor should liability be imposed upon a doctor for an unfavorable, unforeseeable outcome which was not the result of negligence. *Nelson v. Murphy,* 42 Wn.2d 737, 258 P.2d 472 (1953); *Crouch v. Wyckoff,* 6 Wn.2d 273, 107 P.2d 339 (1940). The law does not hold a physician to a standard of infallibility. *Hunt v. Bradshaw,* 251 F.2d 103 (4th Cir. 1958).

■ The instruction is likewise challenged which read:

A physician is not liable for an honest error of judgment if, in arriving at that judgment, the physician exercised reasonable care and skill, within the standard of care he was obliged to follow.

The efforts of a physician may be unsuccessful or the exercise of one's judgment be in error without the physician being negligent so long as the doctor acted within the standard of care of his peers. *Dinner v. Thorp,* 54 Wn.2d 90, 338 P.2d 137 (1959). A doctor is liable only for misjudgment when he arrived at such judgment through a failure to act in accordance with the care and skill required in the circumstances. A mistake is not actionable unless it is shown to have occurred because the doctor did not perform within the standard of care of his practice. *Huffman v. Lindquist,* 37 Cal. 2d 465, 234 P.2d 34, 29 A.L.R.2d 485 (1951); *Norden v. Hartman,* 134 Cal. App. 2d 333, 285 P.2d 977 (1955); *Skeffington v. Bradley,* 366 Mich. 552, 115 N.W.2d 303 (1962); *Marsh v. Pemberton,* 10 Utah 2d 40, 347 P.2d 1108 (1959). This instruction also was appropriate as an abstract statement of the law.

The plaintiff has objected to the instruction given on informed consent claiming it is inadequate under the cri-

teria laid down by *ZeBarth v. Swedish Hosp. Medical Center*, 81 Wn.2d 12, 499 P.2d 1 (1972), wrongfully places the burden of proving the failure to inform upon the plaintiff and wrongfully imposes on the plaintiff the obligation to prove by medical testimony a breach of a medical standard of disclosure. The plaintiff claims his proposed instruction on informed consent should have been given. We have commented upon many of the cases in this area in the foregoing opinion of *Holt v. Nelson*, 11 Wn. App. 230, 523 P.2d 211 (1974). In 1972 at the time *ZeBarth v. Swedish Hosp.* was being decided, *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972), *Cobbs v. Grant*, 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505 (1972), and *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972), as well as other cases, were also in the process of decision. We deem it appropriate to review the plaintiff's assignment of error guided primarily by the pronouncement of our highest court in *ZeBarth* but also to take notice of the decisions reached in other jurisdictions which enlighten this area. We review the instruction given, and the instruction proposed cognizant of the fact that at the time that this case was in trial in 1972, few of the decisions which now reflect the direction of this developing area of the law had yet been published. (Appendix I reflects the plaintiff's proposed instruction and the court's instruction. Both contain misleading flaws and neither is approved in toto.) It is suitable that the area be reevaluated and reconciled within the extent of our authority. *See Greene v. Rothschild*, 68 Wn.2d 1, 402 P.2d 356, 414 P.2d 1013 (1965); *Stratton v. Department of Labor & Indus.*, 7 Wn. App. 652, 501 P.2d 1072 (1972).

▮ The contest over whether the failure to inform a patient of the material risks of a medical procedure constitutes an assault upon the patient or a negligent breach of a physician's duty to acquaint the patient with the perils of each medical course of action has been laid to rest. The performance of an operation without first obtaining any consent thereto may fall within the concepts of assault and

battery as an intentional tort, but the failure to tell the patient about the perils he faces is the breach of a duty and is appropriately considered under negligence concepts. *Cobbs v. Grant, supra* at 240; *Wilkinson v. Vesey, supra* at 620; *ZeBarth v. Swedish Hosp. Medical Center, supra* at 23, 29. Due care requires the physician to alert the patient to abnormalities in his body. *Canterbury v. Spence, supra* at 781. As stated in *Wilkinson* on page 620:

> The prevailing view, however, classifies the physician's duty in this regard as a question of negligence because of the absence of the elements of any wilful intent by the physician to injure his patient.

The relationship between a doctor and his patient is one of trust calling for a recognition by the physician of the ignorance and helplessness of the patient regarding his own physical condition. *Canterbury v. Spence, supra* at 781. The duty of the doctor to inform the patient is a fiduciary duty. *Hunter v. Brown,* 4 Wn. App. 899, 905, 484 P.2d 1162 (1971), *aff'd,* 81 Wn.2d 465, 502 P.2d 1194 (1972); *Mason v. Ellsworth,* 3 Wn. App. 298, 308, 474 P.2d 909 (1970). The patient is entitled to rely upon the physician to tell him what he needs to know about the condition of his own body. The patient has the right to chart his own destiny, and the doctor must supply the patient with the material facts the patient will need in order to intelligently chart that destiny with dignity. *Canterbury v. Spence, supra* at 782.

The scope of the duty to disclose information concerning the treatment proposed, other treatments and the risks of each course of action and of no treatment at all is measured by the patient's need to know.[5] The inquiry as to each item of information which the doctor knows or should know about the patient's physical condition is "Would the patient as a human being consider this item in choosing his or her

---

[5]*Cobbs v. Grant* states on page 243: "[A]s an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each."

course of treatment?"[6] *Cobbs v. Grant* referring to the *Canterbury* case states on page 243:

> The court in *Canterbury* v. *Spence, supra,* 464 F.2d 772, 784, bluntly observed: "Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treatment to which he knowledgeably consents to be subjected.

Indeed, it is the prerogative of the patient to choose his treatment. A doctor may not withhold from the patient the knowledge necessary for the exercise of that right. Without it, the prerogative is valueless. *Canterbury v. Spence, supra* at 781, 782, 786.

■ The burden of proving that a physician failed to inform the plaintiff-patient of the available courses of treatment or failed to warn of the consequential hazards of each choice of treatment is on the plaintiff. It is the plaintiff who must initially establish the existence of the elements of an action based on the informed consent doctrine, *i.e.,* the existence of a material risk unknown to the patient, the failure to disclose it, that the patient would have chosen a different course if the risk had been disclosed and resulting injury. *Canterbury v. Spence, supra* at 791; *Mason v. Ellsworth, supra* at 312; *Trogun v. Fruchtman,* 58 Wis. 2d 596, 604, 207 N.W.2d 297, 314 (1973). The burden of proving

---

[6] *Cobbs v. Grant* states on page 245:

"In sum, the patient's right of self-decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision."

a defense when failure to disclose has been established is on the doctor. *Canterbury v. Spence, supra* at 791; *Cobbs v. Grant, supra* at 245. *Trogun* on page 604 places the burden of proof upon the parties as follows:

> We conclude that the burden of proof is on the plaintiff to establish a physician's failure to disclose particular risk information in connection with contemplated treatment, the patient's lack of knowledge of that risk and the adverse effects upon him which followed that treatment. . . . Once the plaintiff has established a prima facie showing of a failure of the physician to inform the patient, the physician must come forward with his explanation of the reasons for not so informing the patient, including evidence that such advice was not customarily given.

(Footnotes omitted.)

Those elements which are the province of the medical profession must be established by the testimony of medical experts in the field of inquiry. Thus, the existence of the risks and alternatives which were present in the particular physical condition would be beyond the knowledge of the layman and would have to be established by medical testimony. On the other hand, those matters which are not within the special province of the training and experience of doctors may be established by the testimony of any witness with knowledge of the particular inquiry, such as whether the patient knew of the risk or whether the average patient would consider the risk in making a decision. *Trogun v. Fruchtman, supra* at 604. There is no need to prove what other doctors might tell their patients in similar circumstances.[7] The doctor has a duty to disclose the

---

[7] "When there is medical testimony which establishes that a risk is material, that alternatives are feasible, and that disclosure of the risk will not be detrimental to the particular patient, we find no reason why expert medical testimony should be required to establish the existence of a duty to disclose such risks. This is not a medical matter. Once materiality, feasibility and the effect of a disclosure on the patient is established by expert testimony, what physicians disclose or do not disclose in a particular locality about the risks and feasible alternatives of certain proposed treatment or surgery, if there is any standard

material risks as a matter of law.[8] The testimony of medical experts is not necessary to establish the duty to disclose that which the law requires. Once the existence of a risk has been established by expert medical testimony, there is no need to take the next step and also prove by expert medical testimony that the doctor should have told the patient about the risk.[9] Once it has been established by

practice, must be a happenstance because medical training and experience would be of little assistance on this aspect of the problem." *Getchell v. Mansfield*, 260 Ore. 174, 181, 489 P.2d 953, 956 (1971).

[8]"The requirement that a patient obtain an expert to evaluate the disclosures made in the light of the prevailing practice in the locality undermines the very basis of the informed consent theory—the patient's right to be the final judge to do with his body as he wills. Blind adherence to local practice is completely at odds with the undisputed right of the patient to receive information which will enable him to make a choice—either to take his chances with the treatment or operation recommended by the doctor or to risk living without it. As will be noted later, the patient is entitled to receive material information upon which he can base an informed consent. The decision as to what is or is not material is a human judgment, in our opinion, which does not necessarily require the assistance of the medical profession. The patient's right to make up his mind should not be delegated to a local medical group—many of whom have no idea as to his informational needs. The doctor-patient relationship is a one-on-one affair. What is a reasonable disclosure in one instance may not be reasonable in another. This variability negates the need of the plaintiff showing what other doctors may tell other patients." *Wilkinson v. Vesey, supra* at 625.

[9]*ZeBarth* cites *Natanson v. Kline*, 187 Kan. 186, 354 P.2d 670 (1960), for the proposition that the standards of the medical profession as established by expert medical testimony are those to be applied by the jury in deciding whether a patient was adequately informed to decide whether to accept or forego a risk. In *Natanson* on rehearing, we find on page 190:

> Whether or not a physician has advised his patient of the inherent risks and hazards in a proposed form of treatment is a *question of fact* concerning which lay witnesses are competent to testify, and the establishment of such fact is not dependent upon expert medical testimony. It is only when the facts concerning the actual disclosures made to the patient are ascertained, or ascertainable by the trier of the facts, that the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances.

*Wilkinson v. Vesey*, 110 R.I. 606, 622, 295 A.2d 676, 686 (1972), commenting on *Natanson* states:

expert medical testimony that a risk existed, then the existence of the risk is the patient's business; and it is not for the medical profession to establish a criteria for the dissemination of information to the patient based upon what doctors feel the patient should be told. *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972); *Mason v. Ellsworth, supra. See also* Comment, *A New Standard for Informed Consent in Medical Malpractice Cases—The Role of the Expert Witness,* 18 St. Louis Univ. L.J. 256 (1973). The patient has a right to know and the doctor has the duty to inform the patient whether the doctor wants to or not. The fiduciary duty of the doctor requires disclosure. There is no room for paternalism or for overprotectiveness. *Getchell v. Mansfield,* 260 Ore. 174, 182, 489 P.2d 953, 957 (1971), said:

> We hold, therefore, that a plaintiff who alleges that a physician failed to warn him of material risks inherent in his treatment, and to advise him of feasible alternatives, need not produce expert medical testimony that it is the custom of physicians in the same or similar localities to give such warnings in comparable cases. The duty to warn and to advise of alternatives does not arise from and is not limited by the custom of physicians in the locality. Rather, it exists as a matter of law if (1) the risk of injury inherent in the treatment is material; (2) there are feasible alternative courses available; and (3)

As explicated in Collins v. Meeker, 198 Kan. 390, 424 P.2d 488 (1967), the *Natanson* rule provides . . . that where a physician is silent and makes no disclosure whatever, he has failed in the duty owed to the patient and the patient is not required to produce expert testimony to show that the doctor's failure was contrary to accepted medical practice but rather that it devolves upon the doctor to establish that his failure to make any disclosure did in fact conform under the existing conditions to accepted medical standards; and that where actual disclosures have been made and are ascertainable, the patient then must produce expert medical testimony to establish that the disclosures made were not in accord with those which reasonable medical practitioners would have divulged under the same or like circumstances.

While there may be strength in numbers as one views the many courts which require expert testimony as to the community standard of revelation by one seeking to recover on the basis of informed consent, this view has come under increasing criticism.

(Footnote omitted.)

the plaintiff can be advised of the risks and alternatives without detriment to his well-being. If there is evidence tending to prove all these elements, the plaintiff is entitled to have his case submitted to the jury under proper instructions. In most cases, expert medical testimony will be necessary to establish each of the three elements.

Harper and James write forcefully that there should be no need in most cases for expert medical testimony to establish that disclosure of certain risks and alternatives is the customary medical practice:

"Since the courts quite rightly recognize room for a doctor's therapeutic discretion in exercising his duty of disclosure, expert evidence of what is proper medical practice in that respect is relevant and is everywhere received. This is as it should be. But courts have generally gone much further and have *required* medical evidence that it is local professional practice to make the disclosure in question before a jury may find a doctor negligent in failing to make it, even where the treatment was an 'elective' one presenting no emergency. *  *  *.

"Such a requirement in these circumstances is, it is submitted, an unwarranted abdication of responsibility and of the individual's right to make an informed choice, to the medical profession. *  *  *." 2 Harper and James, Law of Torts, 60-61 (1956, Supp 1968).

The patient is endowed with the right to know each hazard which the usual person would utilize in reaching his decision. When a reasonable person in the patient's position probably would attach significance to the specific risk in deciding on treatment, the risk is material and must be disclosed. *Canterbury v. Spence, supra* at 787. *Wilkinson v. Vesey,* 110 R.I. 606, 627, 295 A.2d 676, 689 (1972), discusses materiality as follows:

[M]ateriality is to be the guide. It is our belief that, in due deference to the patient's right to self determination, a physician is bound to disclose all the known material risks peculiar to the proposed procedure. Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in

deciding whether to submit or not to submit to surgery or treatment.

(*See* Appendix II.)

Situations may be envisioned where the disclosure of a risk to a patient would be detrimental to the patient. The existence of such a situation is a matter of defense for the doctor. The doctor may present evidence to justify the failure to disclose by his own testimony or by the testimony of other lay or expert witnesses. The doctor may establish the existence of a standard of nondisclosure by medical experts in his field or practice, but it is for the jury to accept or reject whether any standard of nondisclosure should deprive a patient of his right of self-determination. The situations where there was either no requirement of disclosure or where there was a reason for nondisclosure have been illustrated in *Holt v. Nelson,* 11 Wn. App. 230, 523 P.2d 211 (1974).[10] Included are mental incompetence, emergencies, and potential physical trauma or mental disturbance to the patient. *Canterbury v. Spence, supra; Cobbs v. Grant,* 8 Cal. 3d 229, 245, 502 P.2d 1, 12, 104 Cal. Rptr. 505 (1972). A review of the defenses reveals that the validity of a defense is considered from the standpoint of concern for the well-being of the patient.

The jury is capable of deciding whether the doctor did not tell the patient about something that should have been revealed. The jury does not need testimony from physicians about the norm of disclosure in the community. The usual conduct of doctors in this matter is not relevant to the establishment of the liability which is imposed by law. The jury, as lay people, are equipped to place themselves in the position of a patient and decide whether, under the circum-

---

[10]"By our absolving the patient of the need to present medical testimony reflecting a community standard of disclosure, we do not mean to prevent the physician from introducing evidence of such a standard, if one exists, nor does it eliminate the need for a witness with the proper expertise whose testimony will establish the known risks involved in the procedure in controversy. *Mason v. Ellsworth, supra.*" *Wilkinson v. Vesey, supra* at 626.

stances, the patient should have been told. *Wilkinson v. Vesey* stated on page 625:

> The jury can decide if the doctor has disclosed enough information to enable the patient to make an intelligent choice without the necessity of the plaintiff's expert. The plaintiff, of course, must present evidence as to the undisclosed facts and their materiality. If the jury finds the undisclosed information immaterial, the doctor has acted reasonably in withholding it. If it finds the nondisclosure is material, the doctor may have acted unreasonably and will be held liable for his failure to obtain the patient's informed consent.

An instruction outlining the elements of the negligence doctrine of "informed consent" should set forth that it is the duty of a physician or surgeon to disclose to a patient all relevant, material information the patient will need to make an informed decision on whether to consent to or reject the proposed treatment or operation. The jury should also be instructed that the plaintiff-patient must prove by a preponderance of the evidence that (1) the physician failed to inform the patient of a material risk involved in submitting to the proposed course of treatment; (2) the patient consented to the proposed treatment without being aware of or fully informed of the material risks of each choice of treatment and of no treatment at all; (3) a reasonable, prudent patient probably would not have consented to the treatment when informed of the material risks; and (4) the treatment chosen caused injury to the patient. It is also appropriate to instruct the jury that in the event a patient has consented to a proposed treatment or operation, a failure of the physician or surgeon to fully inform the patient of all of the material risks present in his medical situation before obtaining such consent is negligence; and a physician or surgeon is liable for any injury proximately resulting from the treatment if a reasonably prudent person in the patient's position would not have consented to the

treatment if adequately informed of all the significant perils.[11]

■■ The instruction given by the court apprised the jury that the physician must disclose all material facts to the patient. However, the instruction was misleading in emphasizing that the duty to inform existed regardless of negligence or the exercise of due care by the physician "in the procedure itself" without making it clear also that the duty to inform of the risks inherent in the treatment existed as a matter of law. The small but important transgression of the instruction is one of misdirection. The instruction also stressed that the plaintiff was required to prove that he, the plaintiff-patient, would not have consented to the treatment had he been fully informed; while the proper approach requires the plaintiff to prove instead that a reasonable person in the plaintiff-patient's position would not have consented. *See* Comment, *Informed Consent: Alternatives for Illinois,* 4 Univ. of Ill. L.F. 739 (1973). The instruction incorrectly stated the precepts of the law of informed consent. The plaintiff is entitled to a new trial with revised instructions given on res ipsa loquitur and informed consent.

---

[11]The trial court's instruction was vague in its directive to the jury regarding a doctor's duty, imposed by law, to inform the patient of the risks of treatment. The instruction confused the issue by negating consideration of the concepts of negligence or due care in the performance of treatment, a correct statement in the abstract, but a statement which placed the theory of informed consent before the jury in the negative rather than in the affirmative. The trial court's instruction was faulty also in telling the jury to consider whether the plaintiff would have consented rather than to consider whether a reasonably prudent patient in the patient's position would have consented.

The instruction proposed by the plaintiff affirmatively stated the duty of the doctor to inform the patient of material risks as a matter of law. This was proper. Its defect was to introduce the concept of surgery without informed consent as imposing liability on an assault and battery theory. That intentional tort theory is accepted currently only where treatment is performed in the absence of any consent at all.

Appropriately, neither the proposed nor the given instruction would have instructed the jury to measure the duty of the doctor to inform his patient of the material risks of treatment against a standard of disclosure established by expert medical testimony.

■ Since a new trial is indicated, we will indicate our views on questions which might arise again. Both of the assignments of error relating to the exclusion of exhibits were unsupported by cited authority and, therefore, need not have been considered unless meritorious on their face. *Myers v. Harter*, 76 Wn.2d 772, 459 P.2d 25 (1969); *Northern State Constr. Co. v. Robbins*, 76 Wn.2d 357, 457 P.2d 187 (1969); *Brown v. Quick Mix Co.*, 75 Wn.2d 833, 454 P.2d 205 (1969); *Myers v. Western Farmers Ass'n*, 75 Wn.2d 133, 449 P.2d 104 (1969). Both exhibits were offered to impeach the testimony of the defendant-doctor. One excluded exhibit was a letter to the defendant-doctor from the witness Dr. Hickman which discussed the procedure followed by the defendant-doctor in the kidney biopsy. Such an exhibit could not be offered for purposes of impeachment of the defendant-doctor even though the letter was inconsistent with his later testimony since the letter did not contain his statements and, therefore, did not contain inconsistent pronouncements of the person whose credibility was sought to be impeached. The letter, therefore, contained merely the contradictory statements of another, would-be hearsay, and not available for impeachment purposes. As noted in *Jacqueline's Washington, Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 498 P.2d 870 (1972), impeaching evidence affects only the credibility of the witness and is incompetent to prove the substantive facts encompassed therein. The effort to introduce the letter was an impermissible attempt to rebut the testimony of the defendant-doctor through impeachment. The other excluded exhibit contained the handwritten answers to the interrogatories proposed to the defendant-doctor. Nothing in that document was inconsistent with the answers given to the interrogatories except as admitted by the doctor. The trial court was within its discretion in excluding the exhibit as cumulative.

■ The trial court did not submit the issue of post-biopsy care to the jury on the ground that the evidence was insufficient to establish the standard of care required as to the post-biopsy treatment "coupled with requisite evidence

showing a failure of the standard, a breach of the standard as a basis of liability, . . ." We have reviewed the record and concur with the trial court's ruling that the evidence must be found wanting on that issue. Absent special exceptions or situations, a plaintiff-patient must establish the standard of professional practice at the time of the alleged injury by the testimony of the professional equals of the defendant-physician, a failure to meet that standard and resulting injury to himself. *Hayes v. Hulswit,* 73 Wn.2d 796, 440 P.2d 849 (1968); *Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968); *Pederson v. Dumouchel,* 72 Wn.2d 73, 431 P.2d 973, 31 A.L.R.3d 1100 (1967). The physicians who testified were not interrogated directly on this aspect of the case, and our attention has not been called to any evidence that would establish this contention. CAROA 42(g)(ii) reads:

Under this heading the following shall be included: A brief statement of the nature of the case; a short resume of the pleadings and proceedings; the nature of the judgment or appropriate ruling or order from which the appeal is taken; a clear and concise statement of the facts appropriate to an understanding of the nature of the controversy, with page references to the record.

We are not referred to any page in the record containing testimony establishing the post-biopsy standard of care or any breach thereof. We conclude from our review of the record and the absence of reference pursuant to the rule that such evidence does not exist. *See State v. Day,* 7 Wn. App. 965, 971, 503 P.2d 1098 (1972).

Reversed and remanded.

HOROWITZ and FARRIS, JJ., concur.

Petition for rehearing denied July 18, 1974.

Review granted by Supreme Court October 10, 1974.

APPENDIX I

The plaintiff's proposed instruction reads:

You are instructed that a patient has the right to determine what shall be done with his own body. A surgeon must obtain from the patient consent to perform a surgical procedure, such as a kidney biopsy. The consent of the patient must be an informed consent, that is, the physician must inform the patient of all material facts which are necessary to form the basis of an intelligent consent by the

patient, and, in that regard, must inform him of the nature and consequences of the procedure and the reasonably foreseeable risks. If the patient inquires further as to any or all risks involved, the physician must make a complete disclosure of all facts and risks. Surgery performed, without disclosure by the surgeon as above described, constitutes an assault and battery. If you find from the evidence that the defendant physician failed to properly inform the plaintiff as above described, and further find that the plaintiff would not have consented to the surgical procedure if he had been informed, and that the plaintiff was injured as a result of submitting to the procedure, then you should find the defendant liable to the plaintiff for the injuries and damages resulting from said surgical procedure.

The court's instruction reads:

Under the legal doctrine of "informed consent," a patient may recover from a physician for damages proximately caused by a procedure performed without the patient's "informed consent," irrespective of any negligence or lack of negligence of the physician in the procedure itself.

In order to recover on this basis in this case, plaintiff must prove by a preponderance of the evidence:

1. That he was not informed of a reasonably foreseeable risk or that he inquired of defendant as to all risks and was not informed thereof;

2. That he would not have consented to the procedure had he been so informed;

3. That he has been injured as a proximate result of the procedure.

## APPENDIX II

The *Statement of a Patient's Bill of Rights* as promulgated in 1972 by the American Hospital Association includes the following provisions:

1. The patient has the right to considerate and respectful care.

2. The patient has the right to obtain from his physician complete current information concerning his diagnosis, treatment, and prognosis in terms the patient can be reasonably expected to understand. When it is not medically advisable to give such information to the patient, the information should be made available to an appropriate person in his behalf. He has the right to know, by name, the physician responsible for his care.

3. The patient has the right to receive from his physician information necessary to give informed consent prior to the start of any procedure and/or treatment. Except in emergencies, such information for informed consent should include but not necessarily be limited to the specific procedure and/or treatment, the medically significant risks involved, and the probable duration of incapacitation. Where medically significant alternatives for care or treatment exist, or when the patient requests information concerning medical alternatives, the patient has the right to such information. The patient also has the right to know the name of the person responsible for the procedures and/or treatment.

4. The patient has the right to refuse treatment to the extent permitted by law and to be informed of the medical consequences of his action.

. . .

8. The patient has the right to obtain information as to any relationship of his hospital to other health care and educational institutions insofar as his care is concerned. The patient has the right to obtain information as to the existence of any professional relationships among individuals, by name, who are treating him.

9. The patient has the right to be advised if the hospital proposes to engage in or perform human experimentation affecting his care or treatment. The patient has the right to refuse to participate in such research projects.

10. The patient has the right to expect reasonable continuity of care. He has the right to know in advance what appointment times and physicians are available and where. The patient has the right to expect that the hospital will provide a mechanism whereby he is informed by his physician of the patient's continuing health care requirements following discharge.