[No. 6587–1–III.   Division Three.   January 7, 1986.]

RONALD NOEL WATSON, ET AL, *Respondents,* v. CLYDE HOCKETT, ET AL, *Appellants.*

550

*William H. Mays, Eileen M. Lawrence,* and *Williams, Lanza, Kastner & Gibbs,* for appellants.

*Laurie A. Kinerk, Dwayne A. Richards,* and *Richards & Kinerk,* for respondents.

McINTURFF, A.C.J.—By a jury verdict, Dr. Clyde Hockett was found negligent for failure to diagnose a rectal abscess. Ronald Watson was awarded $99,000, offset by 27 percent contributory negligence. Dr. Hockett raises issues regarding jury instructions, particularly as they relate to (1) the patient's duty to follow instructions, (2) the doctor as a guarantor of the result of his treatment, and (3) the physician's right to an honest error of judgment. We affirm.

Dr. Hockett, a resident at the University of Washington, was serving at Family Medicine Yakima Valley. On October 4, 1979, Mr. Watson first consulted Dr. Hockett, complaining of chronic headaches. In reviewing Mr. Watson's patient history Dr. Hockett noted the possibility Mr. Watson may have been overusing prescription drugs which could have been the cause of the tingling and numbness in his lower extremities. Mr. Watson was told to use Cafergot tablets instead of suppositories and was referred to Comprehensive Mental Health for biofeedback and stress reduction therapy for his headaches.

Dr. Hockett stated he did not authorize any prescriptions between October 4, 1979, and Mr. Watson's next consulta-

tion on April 29, 1980, yet the pharmacy records of the Medicine Mart show a list of medications allegedly prescribed by Dr. Hockett for Mr. Watson, specifically Cafergot PB and Fiorinal No. 3, from January to April 1980.

On Friday, April 25, 1980, while at his office, Mr. Watson experienced severe stomach and rectal pain so severe he needed help from two fellow workers to get to his car. He did not seek treatment because the pain faded until Sunday evening, when it became excruciating. On Monday he called for an appointment and was seen by Dr. Hockett on Tuesday, April 29.

Dr. Hockett's exam and notes made on Mr. Watson's chart reflect Mr. Watson had been taking excessive amounts of Fiorinal for headaches, and that the codeine in the Fiorinal caused constipation, requiring the use of laxatives and enemas. He also was using suppositories, despite instructions to the contrary.

Based upon his history, Dr. Hockett determined Mr. Watson had developed constipation resulting in inflammation, pain and itching of the rectum and the skin surrounding it. His examination revealed a 7 cm. area of inflammation and weepy discharge around the rectum, and a small hemorrhoid, with no evidence of a fissure, mass, or internal hemorrhoid. Dr. Hockett prescribed daily use of Colace, a stool softener, hydrocortisone enemas to reduce the inflammation and Anusol cream. Mr. Watson also was advised to stop the use of Fiorinal because of its constipating effect, to return to Family Medicine for follow–up in 1 week and call if his problem worsened.

Within 3 days, Dr. Hockett received the first of several phone calls from Mr. Watson, at his home during the evening. Mr. Watson complained of rectal pain and requested medication. Dr. Hockett refused to prescribe over the phone but recommended Mr. Watson return to Family Medicine or go to the emergency room.

Mr. Watson called Dr. Hockett a second night, complaining of chills, fever, difficulty in urinating, pain and inability to have a bowel movement. Apparently, Mr. Watson did

not call Family Medicine nor did he go to a hospital emergency room. The next contact was on Monday, May 5, when Mr. Watson called Family Medicine to report he was in pain and needed a muscle relaxant medication. The record does not indicate the result of this phone call. On May 6, again at night, Mr. Watson called Dr. Hockett's home, even though Dr. Hockett was not on call. He talked only with Mrs. Hockett who relayed a message from her husband that Mr. Watson should immediately go to the emergency room.

Mr. Watson was admitted to the emergency room at Yakima Valley Memorial Hospital that evening, examined and operated on early May 7 for an ischiorectal abscess. The area was incised and drained, but permanent damage had been done to some of the sacral nerve roots around the rectum, buttocks and scrotum, which affected his urinary, rectal and sexual functions.

During trial defense counsel attempted to introduce testimony of Terry Tate, senior investigator with the Medicaid Fraud Control Unit of the Department of Social and Health Services (DSHS). Mr. Tate was instrumental in the conviction of a Mr. Opplinger, who was the pharmacist at Medicine Mart during the time Mr. Watson was purchasing his prescriptions there. The defense contended Mr. Opplinger was supplying the medicine without benefit of a proper prescription. The testimony was not admitted but a statement was read into the record by defense counsel regarding the judgment and sentence entered against Mr. Opplinger.

The first issue raised is whether the court was obligated to submit defendant's proposed jury instruction 4, which referred to the duty of a patient:

It is the duty of a patient to follow all reasonable and proper advice and instructions given him by his doctor regarding the patient's care, activities, and treatment.

A doctor is not liable for any injury resulting solely from the negligent failure of the patient to follow such advice and instructions.

If a party can argue his theory of the case under the instructions given as a whole, he is not entitled to submis-

sion of his own instruction. *Kjellman v. Richards,* 82 Wn.2d 766, 768, 514 P.2d 134 (1973).

Dr. Hockett contends the disparity in the number of instructions related to the physician's duty, as compared to the patient's duty, prejudiced the jury. Instruction 13[1] adequately defined negligence, contributory negligence and ordinary care. Dr. Hockett was able to argue Mr. Watson's failure to follow his physician's instructions, and the jury apparently conceded the correctness of that argument when it found Mr. Watson 27 percent contributorially negligent. The number of instructions necessary for a jury's understanding of the law is discretionary with the court. *Harris v. Groth,* 31 Wn. App. 876, 881, 645 P.2d 1104 (1982), *aff'd,* 99 Wn.2d 438, 663 P.2d 113 (1983) (citing *Daly v. Lynch,* 24 Wn. App. 69, 73, 600 P.2d 592 (1979)). Instruction 13 was sufficiently explanatory and complete for the jury to reach a verdict under the law. *Harris,* at 881. Thus, we find the court did not abuse its discretion when it refused to submit instruction 4.

Dr. Hockett next argues his proposed instruction 5[2]

---

[1]Instruction 13 stated:

"Contributory negligence is negligence on the part of a person claiming injury or damage which is a proximate cause of the injury or damage complained of.

"If you find contributory negligence, you must determine the degree of such negligence, expressed as a percentage, attributable to the person claiming such injury or damage. The court will furnish you a special verdict form for this purpose. Your answers to the questions in the special verdict form will furnish the basis by which the court will reduce the amount of any damages you find to have been sustained by a party who was contributorily negligent, by the percentage of such contributory negligence.

"Negligence is the failure to exercise ordinary care. It is the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances.

"Ordinary care means the care a reasonably careful person would exercise under the same or similar circumstances."

[2]Defendant's proposed instruction 5 stated:

"You are instructed that a physician employed to treat or administer to a patient does not and cannot insure or in any sense guarantee a satisfactory result, nor is the physician responsible for unsatisfactory results of his treatment or care unless his own lack of professional knowledge and skill or his negligent failure to

should have been submitted, contending it was approved verbatim in *Miller v. Kennedy,* 11 Wn. App. 272, 279–80, 522 P.2d 852 (1974), *aff'd,* 85 Wn.2d 151, 530 P.2d 334 (1975), *appeal after remand,* 91 Wn.2d 155, 159, 588 P.2d 734 (1978).

In *Miller,* the trial court refused to grant a judgment n.o.v. or a new trial following a defense verdict in a medical malpractice case involving an injury received as the direct result of a surgical biopsy procedure on the patient's kidney. Complications followed, which led to the loss of the kidney. The court stated in 91 Wn.2d at 159–60:

> The first part of instruction No. 5 is a cautionary instruction which is properly given as a supplement to the physician's duty of care. It simply reminds the jury that a doctor does not guarantee a favorable result of his professional treatment. Such a supplementary instruction was expressly approved by the Court of Appeals in *Miller v. Kennedy, supra* at 279–80. . . . The "no–guarantee" instruction by itself is not a full and accurate statement of a physician's duty of care, and it would be error to give such an instruction as the sole statement of a physician's duty. Where, as here, though, it is given along with an accurate statement of the basic standard of care, it is a proper instruction.
>
> The second part of instruction No. 5 states that a bad result of treatment *in itself* is not evidence of negligence. . . . The doctrine [of res ipsa loquitur] does not allow the jury to infer a defendant was negligent from the fact of the injury alone, however. The plaintiff must show the other elements were present—that is, the control by the defendant over the instrumentality, and the nature of the injury as ordinarily resulting only from negligence. . . . Instruction No. 5 is neither erroneous nor misleading, and the court did not err in giving the instruction to the jury.

Other than *Miller,* Dr. Hockett does not cite authority to

exercise it is the proximate cause of such result. The fact in a particular case that complications result is not in itself any evidence that the treatment was improper or that the physician failed to exercise the professional knowledge and skill necessary to proper professional practice, nor is it any evidence that the doctor failed to exercise his skill with reasonable care."

support his contention.

The instructions submitted in a particular case are governed by the facts which must be proven in that case. *Allison v. Department of Labor & Indus.*, 66 Wn.2d 263, 267, 401 P.2d 982 (1965); *Harris,* 99 Wn.2d at 447; *Enslow v. Helmcke,* 26 Wn. App. 101, 104, 611 P.2d 1338 (1980). It is clear from the facts of *Miller* the negligence was a direct *result* of the doctor's course of treatment. Even though Dr. Hockett argues Mr. Watson's injuries were the result of unsatisfactory treatment, there was no evidence the rectal abscess was the *result* of the treatment prescribed by Dr. Hockett, it was, rather, the result of a failure to properly diagnose Mr. Watson's condition. Thus, there are no facts to support this instruction and the court properly refused to submit it to the jury. *Wall v. Stout,* 310 N.C. 184, 197, 311 S.E.2d 571, 579 (1984) (instruction that "physician is 'not an insurer of results' should not be given when no issue concerning a guarantee has been raised.").

Dr. Hockett contends his proposed instruction 6 should have been submitted because it was specifically approved in *Miller.* The instruction reads:

A physician or surgeon is not liable for an honest error of judgment if, in arriving at that judgment, the physician or surgeon exercised reasonable care and skill, within the standard of care he was obliged to follow.

The Supreme Court in *Miller* stated in 91 Wn.2d at 160:

Finally, appellant contends the court erred in giving instruction No. 5½, which states that a physician is not liable for an honest error of judgment where he or she exercised the requisite degree of care and skill in arriving at the judgment. The appellate court expressly approved this instruction in *Miller v. Kennedy, supra* at 280. Appellant maintains no issue of judgment appears in this case, thus rendering the instruction misleading. We cannot agree. The exercise of professional judgment is an inherent part of the care and skill involved in the practice of medicine. Certainly Dr. Kennedy was called upon to exercise his professional judgment in performing the delicate surgery of a kidney biopsy.

A review of the appellate court's discussion of the issue in 11 Wn. App. at 280 finds reliance by the court on *Dinner v. Thorp*, 54 Wn.2d 90, 338 P.2d 137 (1959): a physician is not liable where he has exercised an error in judgment so long as the doctor acted within the standard of care of his peers. The issue before us is whether the ruling in *Miller* has been overturned by *Harris*.

A review of *Harris* discloses an exhaustive review of the standard of care to be observed by the medical profession: whether it should be that of a *reasonably prudent* health care provider or the more traditional standard practiced by the profession. The *Harris* court defines its choice in 99 Wn.2d at 451:

> The standard of care against which a health care provider's conduct is to be measured is that of a reasonably prudent practitioner possessing the degree of skill, care, and learning possessed by other members of the same profession in the state of Washington.

Nowhere does the court address the issue raised by the proposed instruction (honest error of judgment). However, it is important to note, the court concludes at page 447: "The Legislature has chosen to impose upon health care providers the same standard of care as is imposed upon other members of society and we must implement that choice." (Footnote omitted.) Are other members of society liable for negligent acts, even though they may be the result of an "honest error in judgment"? As noted by Mr. Watson in his brief, a driver is liable for the results of his negligent driving, even if committed within the context of an honest error of judgment.

Although Dr. Hockett has cited numerous cases in support of his position, the better view is found in several cases, particularly *Teh Len Chu v. Fairfax Emergency Med. Assocs.*, 223 Va. 383, 290 S.E.2d 820 (1982), where the court stated at 386:

> Furthermore, we believe that terms such as "honest mistake" and "bona fide error" have no place in jury instructions dealing with negligence in medical malprac-

tice cases. The terms not only defy rational definition but also tend to muddle the jury's understanding of the burden imposed upon a plaintiff in a malpractice action. If use of the terms were permitted, it would be appropriate to ask: Must a plaintiff prove a "dishonest mistake" or a "bad faith error" in order to recover? The obvious negative answer reveals the vice in the use of the terms.

Similarly in *Wall,* at 194, the court found the instruction unnecessary:

The further instruction that a doctor is not responsible for a mistake in his judgment if, *inter alia,* "the mistake . . . is the result of an honest error," was unnecessary and added nothing to the correct and comprehensive charge earlier given [on the standard of care assigned to the medical profession].

In *Somer v. Johnson,* 704 F.2d 1473 (11th Cir. 1983), the court held the instruction inadmissible since it was conceivable the jury could find the doctor failed to exercise the proper standard of care and yet excuse liability because the failure was due to an honest error in judgment. *See also Veliz v. American Hosp., Inc.,* 414 So. 2d 226, 227 (Fla. Dist. Ct. App. 1982).

■ The argument proposed by Dr. Hockett could easily be made under the general standard of care instruction submitted: *i.e.,* that the error made by the doctor could have been made by any other reasonably prudent doctor acting within the standard of the profession. *See* WPI 105.01 (revised). Thus, we hold instruction 6 to be an improper statement of the law; there was no error in refusing to submit it to the jury.

Finally, Dr. Hockett contends the court erred when it excluded the testimony of Terry Tate, a DSHS investigator in the Medicaid Fraud Control Unit. He argues the refusal to allow Mr. Tate to testify precluded the defense from arguing Mr. Watson illegally obtained his medication, which directly bore upon the credibility of Dr. Hockett and the comparative negligence of Mr. Watson. He also contends excluding the evidence under ER 403 (probative value substantially outweighed by prejudice) was incorrect,

as the balance should be struck in favor of admission, *United States v. Dennis,* 625 F.2d 782, 797 (8th Cir. 1980); that the testimony was relevant, it could have been used with a cautionary instruction, *United States v. Day,* 591 F.2d 861 (D.C. Cir. 1978), and the stipulated reading of the relevant judgment and sentence was no substitute for the actual evidence.

■ ER 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . ." In the comment to ER 403 it is noted:

> In deciding whether to exclude evidence on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction. The availability of other means of proof may also be an appropriate factor.

Whether relevant evidence will be admitted or refused is a decision made within the discretion of the court. *Petersen v. State,* 100 Wn.2d 421, 439, 671 P.2d 230 (1983).

In the offer of proof, Mr. Tate was identified as a senior investigator with the Medicaid Fraud Control Unit who investigated a Mr. Opplinger, who was a pharmacist accused of dispensing prescriptions to Medicaid patients without the proper prescriptions. Nothing was learned involving Mr. Watson:

> THE COURT: Let me ask you, Mr. Tate, did any of your investigation reveal any forged or false prescriptions for Ron Watson?
>
> MR. TATE: Not that I directly looked for, Your Honor, no. He was not a Medicaid patient that I know of.

Dr. Hockett argued Mr. Tate's testimony should have been admitted as relevant to Dr. Hockett's credibility and Mr. Watson's alleged misuse of pain medication. However, the court did allow Dr. Hockett's counsel to read a statement to the jury regarding Mr. Opplinger's judgment and sentence for uttering false prescriptions.[3] In addition, the

---

[3] "MR. MAYS: This is evidence. As a result of an investigation by the office of the Attorney General, Medicaid Fraud Control Unit, a charge was filed against

court noted Dr. Hockett could argue his theory through the testimony of other witnesses regarding the personal relationship between Mr. Opplinger and Mr. Watson (Mr. Toney and Ms. Cotton), the personal prescription history of Mr. Watson (Mr. Murdock) including two incidents where 30 tablets were dispensed instead of 8 (Mr. Baken) and exhibits 13–17.

Not only would the testimony of Mr. Tate have been prejudicial, but it was also of questionable relevance. Thus we find no abuse of discretion.

The judgment of the Superior Court is affirmed.

MUNSON and THOMPSON, JJ., concur.

Review granted by Supreme Court March 7, 1986.

William F. Opplinger, and this is the judgment and sentence.

"This matter coming on before this Court on this date, the State of Washington being represented by David W. Waterbury, Assistant Attorney General for the State of Washington; the defendant, W. F. Opplinger, appearing in person with his court–appointed attorney, Walter Curnutt; and the State of Washington having moved for the imposition of sentence by the Court against said defendant; the defendant having been charged with the crime, Making and Uttering False Prescriptions, committed on or between January 4, 1980, and September 29, 1982, to which charge the defendant after proper arraignment did enter a plea of guilty to the offense."