IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ESTATE OF LORRAINE P. HENSLEY, By and through its Personal Representative, JESSICA WILSON and LORRAINE HENSLEY, by and through her Personal Representative, | ) ) ) ) ) ) | No. 32652-7-III |
| Appellants, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) ) | |
| COMMUNITY HEALTH ASSOCIATION OF SPOKANE (CHAS); PROVIDENCE HOLY FAMILY HOSPITAL; SPOKANE EAR, NOSE AND THROAT CLINIC P.S., and MICHAEL CRUZ, M.D., | ) ) ) ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, J. — The estate of Lorraine Hensley appeals several adverse rulings

before, during and following a four-week medical malpractice trial that ended with

defense verdicts in favor of three of the defendants and a hung jury as to the fourth.

Three defendants cross appeal trial court rulings.

We affirm all of the challenged rulings and remand for trial of the as yet unresolved claim.

FACTUAL AND PROCEDURAL OVERVIEW

Beginning on January 2, 2009, Lorraine Hensley, then 52 years old, sought medical care from Community Health Association of Spokane (CHAS) for a recurrence of sinus infection and dental problems CHAS had treated over a couple of years. She was diagnosed this time with sinusitis—sinus inflammation—likely related to an abscessed molar. The CHAS providers' initial recommendation was to use a steroid spray to decrease swelling and use nasal rinses. On January 9, after Ms. Hensley complained of increasing pain, an odorous discharge, and swelling in the area of her right eye, Ms. Hensley was prescribed oral antibiotics, prednisone to reduce inflammation, and was referred for a CT[1] scan.

The CT scan revealed that the root of the abscessed molar was impinging into Ms. Hensley's lower maxillary sinus. Since the tooth was the source of the infection, CHAS providers gave Ms. Hensley a copy of the CT scan and told to see her dentist. In the weeks that followed, CHAS providers prescribed a different antibiotic and pain medication.

---

[1] Computerized axial tomography.

Ms. Hensley saw her dentist on January 27, her dentist agreed that the molar needed to be removed, and an appointment was made to have it pulled on February 3.

On February 1, Ms. Hensley went to the emergency room of Providence Holy Family Hospital (Holy Family) complaining of continuing sinus pain, swelling and a headache. She was seen by John Hunter, a certified physician assistant, who reviewed the January 9 CT scan; obtained and reviewed another CT scan of her brain; prescribed a different antibiotic and some pain medication; and referred her to see an ear, nose and throat specialist the next day.

On February 2, Ms. Hensley was examined at the Spokane Ear, Nose, and Throat Clinic (the ENT clinic) by Michael Cruz, M.D. She told him her abscessed molar was scheduled to be removed the next day. Dr. Cruz performed an endoscopic exam, took a culture for testing, prescribed prednisone for inflammation, a painkiller, and recommended a decongestant.

On the late evening of February 3, 2009, Ms. Hensley returned to the Holy Family emergency room, complaining of worsening pain, and was seen by Dr. Christopher Tullis, an emergency room physician. She told him about her tooth removal earlier in the day. After taking her history and performing a physical examination, he administered intravenous antibiotics and pain medication (Dilaudid) before discharging her in the early morning hours of February 4.

On February 6, 2009, Ms. Hensley died. The cause of death, identified at autopsy, was brain herniation resulting from cerebral meningitis. A small hole was found in the back wall of Ms. Hensley's frontal sinus bone that was too small for the medical examiner to measure and an abnormal 4-millimeter hole was found in her dura (one of the meninges, the membranes that surround the brain). The two holes proved to be the pathway through which infection had reached the brain, causing Ms. Hensley's death.

In 2012, Ms. Hensley's estate brought this action against CHAS, Holy Family, the ENT clinic and Dr. Cruz, alleging medical negligence and lack of informed consent. The estate contended that the January 9 CT scan revealed Ms. Hensley was at high risk for intracranial complications. It asserted that the standard of care required admitting Ms. Hensley to a hospital for continuous intravenous antibiotics, surgical intervention, and further testing. The estate also asserted lack of informed consent to the less aggressive treatment provided by the defendants.

Pretrial summary judgment motions and counter motions were all denied. The matter proceeded to trial in May 2014. During trial, the court denied several motions for judgment as a matter of law, including defense motions to dismiss the medical negligence claims for failure to establish a breach of the standard of care to the required degree of medical certainty, and for failing to establish that the independent contractors who treated Ms. Hensley in Holy Family's emergency room were the hospital's agents. In arriving at

4

final jury instructions, the trial court agreed with the defense that there was insufficient evidence to submit the estate's lack of informed consent claim to the jury.

Defense verdicts were returned in favor of CHAS, the ENT clinic, and Dr. Cruz. Although the jury found that providers at CHAS violated the standard of care, it found that the violation was not the proximate cause of Ms. Hensley's death. The jury found no violation of the standard of care by Dr. Cruz or the ENT clinic.

The jury was unable to reach a verdict on the estate's claim against Holy Family, and the court declared a mistrial as to the hospital.

In June 2014, the estate filed a motion for a new trial based on the court's refusal to instruct the jury on informed consent and on alleged juror misconduct. It supported its allegation of juror misconduct with the declaration of one of the jurors, who asserted that two other jurors "shut[ ] down" jurors who spoke in favor of the estate, exhibited bias in favor of medical providers, made pejorative statements about the estate's attorney, discounted the court's instructions on causation, and offered evidence of their own experiences with medical treatment. Clerk's Papers (CP) at 937. The trial court denied the motion and entered judgment on the jury verdicts.

The estate appeals and three of the defendants cross appeal, presenting a total of six issues. A more detailed procedural history is provided in analyzing the respective issues.

5

No. 32652-7-III
*Estate of Hensley v. Spokane Cmty. Health Ass'n.*

## ANALYSIS

The following errors are assigned:

By the estate:

- The trial court erred in denying the estate's motions for summary judgment against Holy Family and CHAS on the elements of medical negligence liability and causation;

- The trial court erred in refusing to instruct the jury on the estate's informed consent claims; and

- The trial court erred in refusing to grant a new trial on the basis of jury misconduct.

By Holy Family:

- The trial court erred in denying Holy Family's motions for judgment as a matter of law that the estate failed to present evidence creating a jury issue of agency; and

- The trial court erred in denying defense motions for judgment as a matter of law that the estate failed to present evidence creating a jury issue of a violation of the applicable standard of care.

By the ENT clinic and Dr. Cruz:

- Both join Holy Family in contending the trial court erred in denying defense motions for judgment as a matter of law that the estate failed to present evidence sufficient to create a jury issue of a violation of the applicable standard of care.

We address the issues in the order stated.

## I. APPEAL

*A. We will not consider the estate's assignment of error to the trial court's order denying its motions for summary judgment because following trial, the challenge to the sufficiency of evidence must be to the trial evidence*

6

Within a few months after the estate's complaint was filed, the defendants moved for summary judgment on the basis that the estate had not demonstrated a prima facie case. The estate responded with a counter motion for summary judgment, an accompanying declaration of Dr. Steven Kmucha alleging violations of the standard of care and lack of informed consent on the part of all defendants, and argument that a right to point to deficiencies in the other side's evidence "works both ways." CP at 28.

The defendants challenged the sufficiency of Dr. Kmucha's declaration to raise a genuine issue of material fact, arguing that as an otolaryngologist,[2] he could not testify to the standard of care of the emergency medical care providers contracted by Holy Family or the family practitioners at CHAS, and that he failed to provide evidence as to the standard of care in the State of Washington.[3]

CHAS responded with only a conclusory declaration from its family practitioner denying that he violated the standard of care. Holy Family, reporting difficulty obtaining declarations from Mr. Hunter and Dr. Tullis, submitted only declarations from their

---

[2] An otolaryngologist is "[a] physician who specializes in" the "diseases of the ear, pharynx, and larynx, including the upper respiratory tract and diseases of the head and neck, tracheobronchial tree, and esophagus." STEDMAN'S MEDICAL DICTIONARY 1395 (28th ed. 2006) (combining the definitions of otolaryngologist and otolaryngology).

[3] RCW 7.70.040(1) provides that one of the elements a plaintiff must establish for a claim of medical negligence is that the defendant health care provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances."

7

attorney, who claimed to have been told by both clients that they denied having violated the standard of care. According to CHAS and Holy Family, the asserted deficiencies in Dr. Kmucha's declaration reduced their concern about the estate's counter motion.

The ENT clinic and Dr. Cruz, whose standard of care Dr. Kmucha was more clearly qualified to address, submitted a detailed opposition declaration from Dr. Cruz. The estate does not contend it was entitled to summary judgment against them.

On June 22, the trial court heard argument of both sides' motions. It orally denied the estate's counter motion on two grounds. As to CHAS and Holy Family, it found a question of fact whether Dr. Kmucha, as an otolaryngologist, could testify to the standard of care of the family practice and emergency medical care providers. As to all defendants, it found Dr. Kmucha's declaration to be statutorily deficient because he asserted that the standard of care in Washington was the national standard but without explaining his basis for that assertion. Denial of the estate's counter motion was reduced to a written order.[4]

---

[4] Rather than grant defense motions to dismiss the complaint on the basis of Dr. Kmucha's failure to provide a foundation for his knowledge of the Washington standard of care, the court gave the estate a deadline for obtaining a supplemental declaration from Dr. Kmucha that would cure that deficiency. The estate complied.

After providing Dr. Kmucha's supplemental declaration, the estate asked the court to allow the supplemental declaration to relate back, in effect, as a basis for reconsidering the court's denial of its counter motion for summary judgment. The court refused, stating in its order, "It was never my intention to grant Plaintiffs' countermotion for summary judgment." CP at 301.

The estate's first assignment of error is to this denial of its motion for summary judgment against CHAS and Holy Family. It argues that evidence offered in opposition to its motion was conclusory in the case of CHAS and inadmissible hearsay in the case of Holy Family.

It is well settled that "[w]hen a trial court denies summary judgment due to factual disputes . . . and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial, not from the denial of summary judgment." *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993) (citing *Johnson v. Rothstein*, 52 Wn. App. 303, 759 P.2d 471 (1988)). The rule is supported by policy (we favor the decision that is based on the best record) and by the purpose of summary judgment (the objective of avoiding useless trials is no longer served once trial takes place). *Johnson*, 52 Wn. App. at 306-07.

The estate argues that a summary judgment denial is subject to review if the facts are not disputed and the decision turned solely on a substantive issue of law, citing *Kaplan v. Northwestern Mutual Life Insurance Co.*, 115 Wn. App. 791, 799-800, 65 P.3d 16 (2003). In *Kaplan*, the issue of law decided incorrectly at summary judgment was whether an ambiguous disability insurance policy was required to be construed against the insurer. On facts that were sufficient and undisputed, the correct legal answer was yes, but the court said no and allowed the meaning of the policy to be determined by the jury. The decision on that pure legal issue was held appealable.

9

In this case, one basis for the trial court's denial of the estate's motion as it related to CHAS and Holy Family was that a question of fact existed as to whether Dr. Kmucha could testify to the standard of care of their family practice and emergency medical care providers. While Dr. Kmucha's declaration stated he was "well familiar with the national standards of care of medical professional treatment for processes such as acute sinusitis" and expressed his opinion that providers at CHAS and Holy Family provided medical care below the standard "in the profession or class to which that provider belongs," he offered no explanation as to how he was familiar with the standard of care of family practitioners and emergency medical care providers. CP at 42.

CR 56(e) provides that a supporting affidavit such as that provided by Dr. Kmucha "shall show affirmatively that the affiant is competent to testify to the matters stated therein." Under the rule, declarations that contain conclusory statements unsupported by facts are insufficient for purposes of summary judgment. *Davies v. Holy Family Hosp.*, 144 Wn. App. 483, 495-96, 183 P.3d 283 (2008) (citing *Guile v. Ballard Cmty. Hosp.*, 70 Wn. App. 18, 25, 851 P.2d 689 (1993)).

"To testify that the defendant has breached the applicable standard of care, 'a physician must demonstrate that he or she has sufficient expertise in the relevant specialty.'" *Id.* at 494 (quoting *Young v. Key Pharm., Inc.*, 112 Wn.2d. 216, 229, 770 P.2d 182 (1989)). In *Davies*, a plaintiff submitted declarations of a Washington physician who was board certified in radiology, offering his opinion as to a breach of the

10

standard of care by members of Holy Family's medical staff. This court held that because the expert's declarations failed to establish that he had sufficient expertise or familiarity with the standard of care applicable to nurses and other health care providers, he "[could not] be deemed competent to establish the standard of care or to testify regarding a breach of that standard." *Id.* at 496. The expert conclusorily claimed familiarity with the appropriate measures that should have been taken by hospital staff in treating the plaintiff, but this court held that his declarations did not affirmatively show that he "had sufficient expertise to be considered qualified to express an opinion regarding the standard of care applicable to nurses and other health care providers. In fact, [his] declarations fail to reference any education, medical training, or supervisory experience that could demonstrate his familiarity with the standard of care in other health care fields." *Id.* at 495.

A party responding to summary judgment can show that genuine issues of material fact require trial in two ways: (1) with conflicting evidence, or (2) by argument alone, if the moving party's evidence is insufficient. "If the moving party fails to sustain [its initial burden of production], it is unnecessary for the nonmoving party to submit affidavits or other materials." *Hash v. Children's Orthopedic Hosp. & Med. Ctr.*, 49 Wn. App. 130, 132, 741 P.2d 584, (1987), *aff'd*, 110 Wn.2d 912 (1988). In opposing the estate's early counter motion for summary judgment, CHAS and Holy Family persuaded the court that the estate's evidence was insufficient.

11

The trial court did not deny summary judgment based on an issue of substantive law; it denied summary judgment because the estate presented too little evidence that Dr. Kmucha was qualified to express an opinion regarding the standard of care applicable to family practitioners or emergency medicine providers. The usual rule barring post-trial appeal of summary judgment denial applies.

*B.      The trial court properly refused to instruct the jury on informed consent*

The estate next assigns error to the trial court's refusal to instruct the jury on its lack of informed consent claim. The court never limited the estate's effort to present evidence in support of that claim. The court reserved ruling on a defense motion in limine to exclude evidence and argument in support of the claim, and later denied a defense motion for a directed verdict dismissing the claim at the end of the estate's case. Ultimately, the court refused to instruct on the claim, however, stating "this, fundamentally, is not an informed consent case, this is a medical negligence case." Report of Proceedings (RP)[5] at 3355. It reiterated that primary reasoning in denying the estate's new trial motion, stating, "[M]y view is that this is a standard of care issue, a negligence issue." RP (July 11, 2015) at 56. On both occasions, the court also observed that the estate had not presented expert testimony on the likelihood of the risk that a

---

[5] Unless otherwise indicated by a parenthetical date, "RP" refers to the 3603 page report of proceedings that begins with proceedings on May 2, 2014, continues through trial proceedings up until the conclusion of closing arguments, and includes, at 3554-3603, hearings taking place on June 22 and July 20, 2012.

patient diagnosed with sinusitis and exhibiting the condition reflected on the CT scans would suffer an intracranial infection and death.

Judgment as a matter of law is appropriate only when, after construing all facts and reasonable inferences in favor of the nonmoving party, the court determines no competent and substantial evidence exists to support a verdict. *Paetsch v. Spokane Dermatology Clinic, P.S.*, 182 Wn.2d 842, 848, 348 P.3d 389 (2015). "Substantial evidence" is evidence sufficient "to persuade a rational, fair-minded person that the finding is true." *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012). Review is de novo. *Paetsch*, 182 Wn.2d at 848.

The Washington Supreme Court first recognized the doctrine of informed consent in *ZeBarth v. Swedish Hospital Medical Center*, 81 Wn.2d 12, 499 P.2d 1 (1972). Three years later, the legislature adopted RCW 7.70.050 with the intent to codify the common law doctrine as set forth in *Miller v. Kennedy*, 11 Wn. App. 272, 522 P.2d 852 (1974), *aff'd per curiam*, 85 Wn.2d 151, 152, 530 P.2d 334 (1975); *Anaya Gomez v. Sauerwein*, 180 Wn.2d 610, 617, 331 P.3d 19 (2014). *Miller* explained that the duty to warn and advise of alternatives exists if "'(1) the risk of injury inherent in the treatment is material; (2) there are feasible alternative courses available; and (3) the plaintiff can be advised of the risks and alternatives without detriment to his well-being.'" *Miller*, 11 Wn. App. at

13

286-87 (quoting *Getchell v. Mansfield*, 260 Ore. 174, 182, 489 P.2d 953 (1971)).[6] The informed consent doctrine affirms an "individual's right to ultimately control what happens to [her] body." *Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 313-14, 622 P.2d 1246 (1980).

In this case, the view of the estate's medical experts was not that this was a case in which (1) there were "feasible alternative courses available" one being the course of treatment followed by the defendant providers, (2) that each met the standard of care, and (3) the patient had a right to know about each and its attendant risks. They opined, instead, that the course of treatment followed by the defendant providers fell far short of the standard of care. Arguably that alone demonstrates that this was a medical negligence case, not an informed case. Since RCW 7.70.050(1) does not clearly recognize that distinction, however, we examine the parties' positions further.

---

[6] The statute requires proof of the following four elements:

> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
> (d) That the treatment in question proximately caused injury to the patient.

RCW 7.70.050(1)(a)-(d).

14

The defendant providers rely on well settled Washington law that a health care provider who misdiagnoses a patient's condition is not subject to an action based on failure to secure informed consent with respect to treatments for the undiagnosed condition. *See, e.g., Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 661, 975 P.2d 950 (1999). This is because "a health care provider who believes the patient does not have a particular disease cannot be expected to inform the patient about the unknown disease or possible treatments for it." *Anaya Gomez*, 180 Wn.2d at 618. In such circumstances, it is a medical negligence claim that compensates the patient for the provider's misdiagnosis and resulting failure to provide appropriate treatment. *See id.*

The estate argues that this well settled law does not apply because this is not a misdiagnosis case. According to the estate,

> The condition that Ms. Hensley had (i.e., bony erosion and the frontal sinusitis), was not undiagnosed. It was present in living color on CT imaging. These providers didn't fail to diagnose the condition, they simply minimized the risk of the known condition. They chose not to tell Mrs. Hensley about her condition, or alternative treatments.

Appellant's Reply Br. at 26-27 (footnote omitted). The estate's experts agreed with the sinusitis diagnosis and the presence of the bony erosion in the maxillary sinus. The estate contends that Ms. Hensley acquiesced in the defendant providers' nonaggressive treatment plan without being informed of the risk of intracranial complications and death, whose materiality it argues was supported by its experts' testimony and should have been a question for the jury.

15

This case illustrates that it is a mistake to place too much emphasis on "diagnosis" when a patient's experts are prepared to agree with a diagnosis but espouse a completely divergent view of facts material to treatment and management given the patient's presentation.[7] Washington cases hold that the doctrine of implied consent requires only that health care providers disclose material facts and risk relating to treatment of which they are subjectively aware. As the seminal decision in *Miller*[8] recognizes, the doctrine of informed consent is a "negligence doctrine." 11 Wn. App. at 282, 289.

In *Burnet v. Spokane Ambulance*, for example, there was evidence that the treating physician was unaware of the risk to his patient of brain herniation and subsequent injury. As the court observed, "[i]t is undisputed Mr. Graham was unaware of Tristen's condition which implicated risk to her, so he had no duty to disclose." 54 Wn. App. 162, 169, 772 P.2d 1027 (1989) (*Burnet* I). In *Gustav v. Seattle Urological Associates*, 90 Wn. App. 785, 790-91, 954 P.2d 319 (1998), the court held that a lack of informed consent claim could not be based on a condition that had not been diagnosed but also could not be based on the treating physician's lack of understanding of different assays

---

[7] Defendants dispute whether the plaintiff's experts actually did agree with the diagnosis, pointing to testimony by a defense expert that in substance, the plaintiff's experts were relying on a diagnosis of "complicated acute frontal sinusitis," which is different. *See* RP (July 11, 2015) at 39; RP at 2835 (stating "it's a bit of semantics").

[8] *See Smith v. Shannon*, 100 Wn.2d 26, 30, 666 P.2d 351 (1983) (citations omitted) ("The seminal case on informed consent in this case is *Miller v. Kennedy* . . . . This Court of Appeals opinion bears the strong stamp of approval by this court, which unanimously and unequivocally approved it.").

16

used in testing and failure to inform his patient of material facts on that score. Whether he should have understood the difference in the assays "raised the question of negligence . . . , not informed consent." *Id.* at 791.

No evidence was presented that any of the defendant providers subjectively knew, given the sinusitis diagnosis and Ms. Hensley's presentation (including the CT scans), that anything approaching a serious risk of intracranial infection and death existed. The estate contends that they should have recognized the risk and responded differently but that was the basis of the medical negligence claims. The estate presented those claims to the jury.

The estate implies on appeal that the defendant providers did subjectively know of the risk and "simply minimized [it]" and "chose not to tell Mrs. Hensley." Appellant's Reply Br. at 27. It likens the estate's claim to the facts in *Flyte v. Summit View Clinic*, 183 Wn. App. 559, 579-80, 333 P.3d 566 (2014), in which a lack of informed consent claim was remanded for trial because the evidence raised a jury question about the defendant physician's subjective knowledge.

The defendant physician in *Flyte* testified at trial that he had ruled out a diagnosis of influenza, which was ultimately the cause of his patient's death. Having ruled it out, he argued that he had no obligation to inform the patient of facts material to treatment for that diagnosis. *Id.* at 579. But his chart notes did not support his trial testimony that he had ruled out influenza. The patient's father, who accompanied her into the exam room,

17

testified that the physician *said* she had influenza. *Id.* Where evidence supporting a health care provider's subjective knowledge of a material fact is presented but disputed, the court should instruct the jury on informed consent—including the limitation of informed consent to matters known by the health care provider. The jury can then decide what the health care provider knew. Matters that "should have been" known can be addressed by the patient's medical negligence claim.

In this case, construing all facts and reasonable inferences in favor of the estate, no competent and substantial evidence at trial supported a claim that the defendant providers knew that Ms. Hensley was at a material risk of intracranial infection and death but minimized that risk or chose not to disclose it to her. Here, unlike in *Flyte*, there are no contradictory chart notes. There were no witnesses to damning admissions. The expert testimony as a whole demonstrated that the estate's medical experts did not speak for the entire profession. And the estate offered no evidence of any reason or motive for the defendant providers to withhold subjective knowledge of material facts.

The estate's evidence was, instead, that the defendant providers failed to recognize and act on the asserted risk: its medical negligence claim. Like the trial court in *Anaya Gomez*, the trial court below allowed the estate to present evidence but then reasonably refused to instruct on the lack of informed consent claim.[9] Because we may affirm the

---

[9] In the trial court, the estate also argued that the facts of its case were similar to those in *Gates v. Jensen*, 92 Wn.2d 246, 595 P.2d 919 (1979), which our Supreme Court

18

trial court on this basis, we need not reach the estate's challenge to the court's secondary basis for its ruling: that the estate presented insufficient evidence of the likelihood of intracranial infection and death.

C.       *The trial court did not abuse its discretion in denying the motion for a new trial on the basis of juror bias or misconduct*

The estate finally argues that juror bias or misconduct required a new trial.

### Juror bias

We first address the distinct situation where a juror's bias is evidenced by dishonesty in voir dire, thereby depriving a party of the opportunity to challenge the prospective juror for cause. This type of juror misconduct has been said to deprive a

---

identified in *Anaya Gomez* as presenting the limited circumstance in which a misdiagnosis case can also present an issue of informed consent: "The determining factor is whether *the process* of diagnosis presents an informed decision for the patient to make about his or her care." 180 Wn.2d at 623 (emphasis added). In *Gates*, an ophthalmologist failed to diagnose a patient's glaucoma. The ophthalmologist had treated the patient for over two years, had seen consistently high eye pressure readings that pointed to her higher risk for glaucoma, had available two additional diagnostic tests that were simple, inexpensive and risk free, and yet not only did not employ the tests but did not tell the patient they were an option. *Id.* at 621. *Anaya Gomez* limits *Gates* to its "unique set of facts" "aris[ing] during the diagnostic process." *Id.* at 623. It observes that "*Gates* is the exception and not the rule with regard to the overlap between medical negligence and informed consent" and "[g]iven the unique factual situation in *Gates*, it is unlikely we will ever see such a case again." *Id.* at 626.
        The *Gates* exception would apply if Ms. Hensley had shown consistent signs of being at high risk of having a pathway for the infection from her abscess to reach the brain; there were simple, inexpensive, and risk free diagnostic tests for determining whether such a pathway existed; and her treating providers failed to inform her of the option of having those tests performed. There was no such evidence here.

party of a constitutional trial. *E.g., Allison v. Dep't of Labor & Indus.*, 66 Wn.2d 263, 265, 401 P.2d 982 (1965). *Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 776 P.2d 676 (1989), on which the estate relies, is such a case.[10]

As the United States Supreme Court has observed:

Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984).

Whether a party is entitled to a new trial for juror bias is subject to its own test, recognized in *McDonough* and later adopted in Washington. In *McDonough*, the Supreme Court held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. It added that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

---

[10] As observed in *State v. Cho*, 108 Wn. App. 315, 323, 30 P.3d 496 (2001), *Robinson* applied a standard for challenging a verdict that was more lenient than current Washington law.

20

The *McDonough* standard was adopted in Washington in a capital case, in which our Supreme Court held that a prospective juror's incorrect responses to two questions asking if he had been the victim of a crime or of a sexual offense did not warrant a new trial. *In re Elmore*, 162 Wn.2d 236, 267-68, 172 P.3d 335 (2007) (citing the observation in *In re Det. of Broten*, 130 Wn. App. 326, 336, 122 P.3d 942 (2005) that Washington cases are in accord with the *McDonough* standard for granting a new trial for juror bias)).

In this case, the estate contends that bias on the part of the presiding juror and another male juror identified as "Jay" deprived it of a fair trial. Its opening brief summarily identifies the portions of voir dire on which it relies. Br. of Appellant at 38-40. We have set out in full, in an appendix, the lawyers' statements and questions that the estate identifies. The estate relies for the most part on the lawyers' general admonitions about the purpose of voir dire and the need for honest answers, but without identifying any question it contends was answered dishonestly by the presiding juror or Jay. The estate also relies on Holy Family's questions about jurors' emergency room experiences, but here again, it identifies no question that the presiding juror or Jay answered dishonestly.

Since there is no dishonestly answered question that, if answered honestly, would have been a basis for excluding the juror for cause, the trial court had no basis for

21

No. 32652-7-III
*Estate of Hensley v. Spokane Cmty. Health Ass'n.*

ordering a new trial.[11]

### Other misconduct

The estate's remaining charges of misconduct rely on its juror affiant's allegations that the presiding juror and Jay advocated for the defense and "'shut[ ] down'" jurors who disagreed with them. CP at 937. The estate's affiant also claims the presiding juror and Jay made the following statements during deliberations:

- That doctors should not be sued for trying to do their job; or if they only see a patient once; or if, like CHAS's providers, they deal with a lot of poor people and are not properly paid;

- Statements about Ms. Hensley's health condition delivered "in a pejorative fashion";

- That it was well known the estate's lawyer only took "big money cases"; the jurors knew she could "twist things around"; and that her argument that the "more probable than not" instruction applied to causation as well as to the standard of care was "spin"; and

- That Jay's mother had been administered Dilaudid at the emergency room and was discharged with slurring speech (like Ms. Hensley) but his mother was fine.

CP at 938-39. The defendants responded with a declaration of the presiding juror, who denied personally making the improper statements alleged by the estate's affiant, denied

---

[11] In a statement of additional authority, the estate directs our attention to the recent United States Supreme Court decision in *Pena-Rodriguez v. Colorado*, ___ U.S. ___, 137 S. Ct. 855, 197 L. Ed. 2d 107, 125 (2017), which recognizes an exception to the federal no-impeachment rule for a juror's "clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." The decision was based on "unique historical, constitutional, and institutional concerns" implicated by racial bias. *Id.* at 124. It has no application to this case.

22

or claimed not to recall other jurors making the improper statements, asserted that no juror was shut down, and claimed that jurors were encouraged to, and did, follow instructions.

Professor Tegland has summarized the well settled two-step process by which a trial court decides a challenge to a verdict based on jury misconduct:

> First, the court determines whether the alleged misconduct is the sort of juror misconduct that can be considered on a motion for new trial. Conduct that inheres in the verdict, or inheres in the jurors' thought processes, cannot be considered, and the inquiry is at an end. If the alleged misconduct *is* the sort [of] misconduct that can be considered, then, as the second step, the court determines whether the misconduct was sufficiently prejudicial to warrant a new trial. On this second step, the outcome is always fact-specific, and the trial court has considerable discretion.

14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 32:29, at 377 (2d ed. 2009).

Assuming for present purposes that the estate's affiant's allegations are true, most inhere in the verdict. Most deal with the affiant's or other jurors' thought processes.

> The mental processes by which individual jurors reached their respective conclusions, their motives in arriving at their verdicts, the effect the evidence may have had upon the jurors or the weight particular jurors may have given to particular evidence, or the jurors' intentions and beliefs, are all factors inhering in the jury's processes in arriving at its verdict, and, therefore, inhere in the verdict itself, and averments concerning them are inadmissible to impeach the verdict. . . .
> A different rule, one permitting jurors to impugn the verdicts which they have returned by asserting matters derogatory to the mental processes, motivations and purposes of other jurors or purporting to explain how and why a juror voted as he did in arriving at his verdict, would inevitably open nearly all verdicts to attack by the losing party and thwart the courts in

23

achieving a long held and cherished ambition, the rendering of final and definitive judgments.

*Cox v. Charles Wright Acad., Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967) (citations omitted).

A failure to understand or follow the jury instructions also inheres in the verdict. *E.g.*, *State v. McKenzie*, 56 Wn.2d 897, 900, 355 P.2d 834 (1960) (juror argued law was contrary to instruction); *Ralton v. Sherwood Logging Co.*, 54 Wash. 254, 256, 103 P. 28 (1909) (ignored court's instructions). Whether jurors feel threatened or pressured inheres in the verdict. *State v. Standifer*, 48 Wn. App. 121, 127-28, 737 P.2d 1308 (1987) (juror sensed peer pressure to decide the case in a particular way); *State v. Aker*, 54 Wash. 342, 346, 103 P. 420 (1909) (juror's acquiescence after other jurors threatened to report the juror's connection to a party).

What the estate characterizes as improper extrinsic evidence—Jay's mother's response to Dilaudid—falls within well settled law allowing jurors to use personal life experiences to evaluate the evidence presented at trial. *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 204, 75 P.3d 944 (2003).

The estate's evidence of juror misconduct fails at the first step of the verdict challenge analysis, because the misconduct alleged is not the sort that can be considered on a motion for a new trial.

The trial court also considered prejudice, observing that the estate's "closest" case for a comment that could have some impact on a jury verdict was that "you shouldn't sue a doctor if they only see a patient once"—but the court then stated it was "really, really unclear" that the statement had any impact here. RP (July 11, 2015) at 63. Given the trial court's opportunity to observe the witnesses and its familiarity with the evidence, we give great deference to its determination that the complained of conduct, if it occurred, did not affect the verdict. *See McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 759, 260 P.3d 967 (2011).

## II. CROSS APPEALS

*A. The trial court did not err in denying Holy Family's motions for a directed verdict on the basis of a failure to present evidence of agency*

Mr. Hunter and Dr. Tullis, who provided Ms. Hensley's care at Holy Family, are not employees of the hospital. The estate alleged that they were agents, for whose negligence Holy Family was vicariously liable. "Under apparent authority, an agent (e.g., a doctor) binds a principal (e.g., a hospital) if objective manifestations of the principal 'cause the one claiming apparent authority to actually, or subjectively, believe that the agent has authority to act for the principal' and such belief is objectively reasonable." *Mohr v. Grantham*, 172 Wn.2d 844, 860, 262 P.3d 490 (2011) (quoting *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994)). "A finding of apparent

25

agency can subject a hospital to vicarious liability for the negligence of contractor physicians or staff working at the hospital." *Id.* at 860-61.

Holy Family moved for a directed verdict at the close of the estate's case, arguing that the estate had presented no evidence of Mr. Hunter's and Dr. Tullis's ostensible agency for the hospital. The estate responded that agency "was not a disputed issue coming into this trial" and was not identified as such on the joint trial report. RP at 1863. The court also expressed surprise that agency was an issue and stated it was "going to deny the motion at this point." RP at 1869.

Holy Family renewed its motion at the end of the evidence, arguing that the record still contained no evidence of agency. The trial court not only denied the motion but instructed the jury that Mr. Turner and Dr. Tullis were Holy Family's agents and it was vicariously liable for their conduct.

At issue is whether Holy Family's conduct leading up to the trial amounted to a judicial admission of agency on which the estate and trial court were entitled to rely. "Judicial admissions are not evidence . . . . . Rather, they are formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission, unless allowed by the court to be withdrawn, is conclusive in the case." 2 KENNETH BROUN, MCCORMICK ON EVIDENCE § 254, 181 (6th ed. 2006) (footnote omitted). Factual stipulations are formal concessions that have the effect of

26

withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. *Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 677-78, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010); *Cf.* CR 2A (stipulations will be recognized if made and assented to in open court or in writing and signed by the attorney disputing the stipulation).

During the hearing on the parties' summary judgment motion on June 22, 2012, Holy Family's counsel stated:

> [COUNSEL FOR HOLY FAMILY]: . . . There's four causes of action here, your Honor; corporate negligence, informed consent, res ipsa loquitur, . . . and the vicarious liability, which would be the activities of Dr. Tullis and Mr. Hunter, represented by Bill Etter.
>
> [THE COURT]: Are they Holy Family staff?
>
> [COUNSEL FOR HOLY FAMILY]: They are. *They would be, your Honor, at a minimum, ostensible agents.* They are not employees, they are independent contractors. *But I think under* Adamski, *they are ostensible agents. I am responsible for—it's odd. I am responsible for their conduct but I don't represent them so it is a unique situation.* Obviously the burden is on plaintiffs today to establish a prima facie case.

RP at 3572 (emphasis added). We agree with the estate that the underlined language appears to be an admission. The italicized language that is not underlined creates ambiguity, however.

At the conclusion of the hearing, the court orally announced its ruling, in which it stated:

27

> Everybody acknowledges that Holy Family . . . would have vicarious liability for the actions of the medical providers involved who are not presently before the court so that is not an issue before me on summary judgment.

RP at 3589. Holy Family did not object to or correct this statement.

The parties filed a trial management joint report in April 2014. The form indicates that it is filed pursuant to Spokane County LCR 16. That rule requires parties to cases governed by a civil case schedule order to jointly prepare "a Trial Management Joint Report (form CI-06.0150)." LCR 16(a). The first page of the court form states, among other matters,

> Failure to fully disclose all items required on this report may result in exclusion or restriction on use of evidence at trial. This is a joint report, requiring counsel to meet, confer, and attempt to resolve differences in the matter [sic] addressed in this report.

CP at 1255.

Section E of the court form reads:

> E. **LIST EACH ISSUE THAT IS DISPUTED** (Issues not identified here may not be raised at trial without leave of court):

CP at 1256.

The parties completed section E by listing the following as "each issue that is disputed":

1. Standard of Care;
2. Informed Consent;
3. Res Ipsa Loquitor;
4. Wrongful Death;

28

     5. Medical Causation;
     6. Nature and extent of any damages;
     7. Comparative fault.

*Id.* The report was signed or electronically approved by lawyers for all parties.

On the same day the trial management joint report was filed, Holy Family filed its trial brief. A section was devoted to argument that evidence would show that Mr. Hunter and Dr. Tullis did not violate the standard of care. There was no discussion of agency.

The Washington Constitution provides judges of the superior courts with authority to adopt "uniform rules for the government of the superior courts." CONST. ART. IV, § 24. The superior courts also have the authority to adopt rules of procedure that are supplementary and do not conflict with statewide rules adopted by the Washington Supreme Court. RCW 2.04.210; RCW 2.08.230. The Washington Supreme Court has adopted a rule that authorizes each superior court to "make and amend local rules governing its practice not inconsistent with these rules." CR 83(a). "Court rules are inconsistent under CR 83(a) only when they are 'so antithetical that it is impossible as a matter of law that they can both be effective.'" *Sorenson v. Dahlen*, 136 Wn. App. 844, 853, 149 P.3d 394 (2006) (quoting *Heaney v. Seattle Mun. Ct.*, 35 Wn. App. 150, 155, 665 P.2d 918 (1983)).

We address the validity and application of a court rule de novo. *Id.* at 850. If a court rule is valid and applies, we review a trial court's exercise of discretion recognized by the rule for abuse of discretion.

29

Spokane County's LCR 16 is not inconsistent with the civil rules. A principal

purpose of the parallel civil rule, CR 16, which provides for pretrial conferences

participated in by the court, is to "compel the parties to disclose their claims and

defenses." *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 503, 933 P.2d 1036 (1997)

(*Burnet* II). Spokane County's LCR 16 simply extends this valuable pretrial exercise to

cases where court time does not permit, or the issues do not require, court participation.

Under both the civil rule and the local rule, the identification of disputed issues is by

agreement.

A trial management report should not be construed as including an admission

where surrounding circumstances suggest that it was merely drafted unartfully or is

incomplete. Here however, there had been other indications that agency was not in

dispute. The trial court did not err in treating the identification of disputed issues in the

April 2014 trial management joint report as a judicial admission for purposes of the May

2014 trial. It therefore did not err in instructing the jury that Mr. Hunter and Dr. Tullis

were Holy Family's agents and that Holy Family was vicariously liable for their conduct.

> B.    *The trial court did not err in denying Holy Family's and the ENT clinic's
> motion to dismiss the estate's medical negligence claim for a lack of
> adequate expert testimony*

Finally, Holy Family and the ENT clinic argue that the court erred in denying their

motions for judgment as a matter of law on the basis that the estate's medical experts did

not testify to opinions based on a reasonable degree of medical certainty. "Expert

testimony is necessary to prove whether a particular practice is reasonably prudent under the applicable standard of care." *McLaughlin v. Cooke*, 112 Wn.2d 829, 836, 774 P.2d 1171 (1989). This expert testimony must be based on a reasonable degree of medical certainty. *Id.*[12]

The trial court denied the motion because it was confident from its trial notes that the estate's lawyer had posed opinion questions to experts in the required form.[13]

With the benefit of the transcript, we can see that while the estate's lawyer sometimes asked a preliminary question as to whether an expert's opinion was based on a reasonable degree of medical certainty, the "reasonable degree of medical certainty" mantra was not repeated every time a question about the expert's opinion was asked. We can also see, however, that the defense attorneys never objected to such questions for lack of foundation nor did they move to exclude the witnesses. The failure to raise a timely foundation objection precludes a party from moving for a new trial on the basis of an

---

[12] The *Restatement (Third) of Torts* observes that "[t]o an expert witness, virtually any proposition may be 'possible,' but the law demands proof by a preponderance of the evidence in civil cases," so "[i]n an effort to screen expert opinions that are speculative, some courts have employed a requirement that an expert testify that an opinion is held to a 'reasonable degree of medical [or scientific] certainty' for it to be admissible." RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 28 cmt. e (AM. LAW INST. 2010). Nonetheless, "the vast majority of those courts state that the standard is equivalent to the usual preponderance requirement" when providing a definition or defining the phrase. *Id.*

[13] We can affirm the trial court's ruling on any basis supported by the record. *LaMon v. Butler*, 112 Wn.2d 193, 200-1, 770 P.2d 1027 (1989).

No. 32652-7-III
*Estate of Hensley v. Spokane Cmty. Health Ass'n.*

inadequate foundation. *Estate of Stalkup v. Vancouver Clinic, Inc., P.S.*, 145 Wn. App. 572, 584, 187 P.3d 291 (2008) (failure to object that physician did not testify to a reasonable medical certainty waived the foundation challenge). Not having objected to the foundation for the plaintiffs' experts' opinions, Holy Family and the ENT clinic were not entitled to judgment as a matter of law.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, A.C.J.

Pennell, J.

32

No. 32652-7-III
*Estate of Hensley v. Spokane Cmty. Health Ass'n.*
Appendix

## APPENDIX

The estate identifies the following statements made or questions posed during voir

dire as relevant to its claim that the presiding juror and Jay were biased:

The estate's voir dire:

> [T]he purpose of this process at this point is to allow me to talk with you a
> little bit about some of the things that we learn through life and through
> experience that become prejudices, that become biases, that become the
> way that we think about things, sometimes without even knowing that we
> think about things that way. So what I want to do is, I want to talk with you
> a little bit about some of the things that may come up in this trial, some of
> the beliefs you may have, about things that may come up in this trial that
> might interfere with your ability to listen fairly to both sides of the
> equation. In order for us to do that I'm going to hope that you'll share with
> me freely, as best as you can in a group, some of the [sic] your beliefs on
> some of these issues.

RP at 125.

CHAS's voir dire:

> You all realize that that rule, is all we want to know, is can the panel that
> sits here, can they be impartial to both sides, truly, to both sides. I think
> that's the goal of this process, the jury selection process, is that we want an
> impartial panel who will listen to the evidence and then listen to the law as
> the judge instructs you on it, and then come to your decision based upon
> that law.

RP at 146-47.

Holy Family's voir dire (questions about experiences in the emergency room) questions
only:

33

. . . [J]uror number 15. I wrote down that you had treatment at the Holy Family emergency room, is that right?

. . . Okay. Can you tell me a little bit about, first of all, when this was?

. . . Okay. And if you're comfortable, what brought you to the emergency room?

. . . All right. Were you admitted to the hospital or just treated in the emergency room?

. . . Did you feel that you were listened to and cared for properly in the emergency room?

. . . And would anything about your previous emergency room experience at Holy Family impact your ability to listen to all the evidence in this case?

. . . [T]hank you. Mr. [ ], I think you said that your children had been treated, if I wrote this down wrong correct me, maybe once at Holy Family and once at Sacred Heart in the emergency room department.

. . . And hospital admission or just treated in the emergency department?

. . . Did you feel that your family's concerns were properly listened to and addressed by the emergency physicians or nurses?

. . . Anything about your previous experience with the emergency departments, understanding it wasn't Holy Family, that would impact your ability to listen to the evidence in this case?

. . . .

. . . Juror number 30, I wrote down that Holy Family and then three question marks so maybe you can fill it in.

. . . Thanks. Tell me about Holy Family.

. . . When was that?

. . . All right. Were any of your children admitted after being treated in the emergency room?

. . . Did you think that your concerns were listened to and you were treated fairly by the emergency room staff?

. . . What do you mean by slow?

. . . Did you have any experience where you thought you were in the waiting room longer than you needed to be?

. . . Pretty fair point there, yeah. I got it. My daughter's crying, it becomes an emergency situation. And anything about your experiences at the emergency room that would cause to you [sic] have trouble listening to go [sic] all the evidence in this case?

. . . Thank you. And then lastly number 48, can you stand for me? I don't want to hazard a guess at your name is so I'll just go with 48. I think you said you had kids in the ER twice within the last six months, is that right?

. . . And was that at Holy Family?

. . . And what was the nature of the ER visits?

. . . Bones or scrapes or bruises, that type of thing?

. . . Were either of your children admitted to the hospital?

. . . Did you think you were treated fairly and equitably and people listen to your concerns at the emergency room?

. . . So someone close to you that you're familiar with had passed away based upon an infection they acquired at Holy Family, is that right.

. . . How did that impact you?

. . . Sure. And how long ago did this church member pass away?

. . . And you still have feelings about what happened to that person?

. . . You think that they probably shouldn't have caught an infection at the hospital and passed away, right?

. . . And you still have those feelings about what happened at Holy Family. And based upon the experience you had, or those close to you you've had, would it impact your ability to listen to the record regarding Holy Family, in particular the emergency department?

. . . Based upon the experience that you've had and those close to you.

. . . Those feelings aren't likely to change in the next three to four weeks as I [sic] you sit here, correct?

. . . Absolutely. Thank you, I appreciate your candor. And I'll finish up real quick by way of show of hands. I'm gonna ask some general questions and try to follow up in the time that I have left. So if you can keep your hands up in the air long enough for me to count them. Anybody here, separate and apart from what the judge asked you, a bad medical experience, I want to know, in particular, if anyone's had a bad experience, you or a loved one, in the emergency room.

. . . Anywhere. You're number 13, is that right?

. . . Number 49, okay.

RP at 149-57.

No. 32652-7-III
*Estate of Hensley v. Spokane Cmty. Health Ass'n.*
Appendix

ENT clinic voir dire:

> . . . Do you have any problems setting aside sympathy that anyone would have for someone that's lost a loved one, and to be objective as you listen to the facts in this case?
> PROSPECTIVE JUROR NO. 12: No. I think with any court case you should be objective.

RP at 164-65.